**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **INTERNATIONAL UNION OF** | : | **Civil No. 1:07-CV-1150** |
| **BRICKLAYERS AND ALLIED** | : | |
| **CRAFTWORKERS, LOCAL 5** | : | |
| | : | |
| **Plaintiff,** | : | **(Conner, J.)** |
| | : | |
| **v.** | : | **(Carlson, M.J.)** |
| | : | |
| **INTER-STATE TILE & MANTEL** | : | |
| **COMPANY, INC.** | : | |
| | : | |
| **Defendant** | : | |

**REPORT AND RECOMMENDATION**

**I      INTRODUCTION**

In this case we are called upon to make recommendations which will write the final chapter in a longstanding saga involving an employee benefit dispute under a collective-bargaining agreement. Specifically, we must consider a Motion for Contempt (Doc. 52), and a Motion to Enforce and Liquidate Judgment, (Doc. 60) filed by the Plaintiff, Local 5, both of which seek to enforce and liquidate an arbitration award entered by a labor arbitrator in March of 2007, following a hearing in December of 2006.

At bottom, these motions invite us to make two closely-related determinations regarding the scope of our review of the arbitrator's order, and the proper measure of damages under the collective bargaining agreement, as that agreement has been construed by the arbitrator in this case. In making these recommendations we most assuredly do not write upon a blank slate. Quite the contrary, over the past four years this dispute has been the subject of an arbitrator's ruling, a decision on the merits by the district court, and litigation in the United States Court of Appeals.

Moreover, in undertaking this task, we recognize that, while the parties have differing views regarding how the calculation of damages should be done, and who should undertake this calculation, once these threshold legal questions are addressed there seems to be little dispute as to what the proper arithmetic calculation of contributions is under the collective bargaining agreement. Nonetheless, the Defendant urges us to refrain from engaging in this calculation, and instead invites us to refer this matter, which began before a labor arbitrator in 2006, back to that arbitrator four years later, in 2010. The Defendant invites us to follow this course so that the arbitrator can consider two matters which could have been presented to that arbitrator, but apparently were not litigated previously in this case. These two issues relate to: (1) the hourly pay rate which should be used in calculating benefits owed under the collective bargaining agreement; and, (2) whether the arbitrator should

consider, as an equitable mitigation matter, the fact that, while the Defendant defaulted on its obligations under the collective bargaining agreement, it did provide other forms of health coverage to its employees. These are claims that have apparently never been timely litigated on their merits by the Defendant throughout the history of this case, either in arbitration, at trial or on appeal.[1]

For its part, the union concedes that the award calculation in this matter should be based upon the lowest prevailing hourly pay rate among Defendants' employees, thus eliminating one of the issues which potentially required clarification by the arbitrator. As for the second issue regarding whether this matter should be remanded to the arbitrator for further proceedings considering non-contractual equitable mitigation questions, such as the defendant's payment of other benefits to its employees, the union opposes this proposal, and instead seeks enforcement of the arbitrator's award.

For the reasons set forth below, we recommend that the Court enforce this longstanding award, while mitigating the amount of the award, by setting that award at the lowest prevailing hourly pay rate under the contract. It is also recommended

---

[1] We note that the defendant is now represented by new counsel in these proceedings, who was not responsible for the initial course of this litigation and who has acted with efficiency, effectiveness and dispatch throughout these proceedings.

that the Court decline the defendant's invitation to remand this matter to the arbitrator for consideration of other equitable mitigation claims that were not advanced in a timely fashion at earlier stages of this litigation.

## II.    STATEMENT OF FACTS AND OF THE CASE

### A.    The Contractual Obligations of the Parties and the Arbitration Decision

This matter involves the enforcement of obligations under a collective bargaining agreement. Those obligations are defined by the express language of the agreement, and are further informed by a lengthy course of dealings between the parties.[2] The Defendant, Inter-State Tile & Mantel, Company, is a business which employs tile workers, some of whom are members of unions such as the Plaintiff, Local 5. Over the span of a number of years, Inter-State and Local 5 entered into a series of collective bargaining agreements, the most recent of which expired on April 30, 2006. When Inter-State elected not to renew the agreement, the majority of Inter-State's employees decided to sever their relationships with Local 5 and to remain employed by Inter-State.

At around the same time that this relationship drew to a close, Inter-State, as part of its business, was also performing work in the jurisdiction of International

---

[2]This factual recital is based upon the District Court's opinion ruling on the cross-motions for summary judgment. (Doc. 28.)

4

Union of Bricklayers and Allied Craftworkers, Local 1 ("Local 1"). In connection with this work, on April 25, 2006, Inter-State signed Local 1's collective bargaining agreement, which expired on April 30, 2009. The Local 1 collective bargaining agreement contains, a provision common to such agreements, called a traveling contractors clause, which provided as follows:

> When the Employer has any work of the type covered by this Agreement to be performed outside of the area covered by this Agreement and within the area covered by the *standard* Collective Bargaining Agreement of another affiliate of the International Union of Bricklayers and Allied Craftworkers, the Employer agrees to abide by the full terms and conditions of the standard Agreement in effect on the job site area with respect to all employees, wherever hired, who perform such work, except as provided in the next sentence of this paragraph. Employees covered by this Agreement who are sent to projects outside of the area covered by this Agreement shall be paid at least the established minimum wage scale required under this Agreement but in no case less than the established minimum wage scale of the local Agreement covering the territory in which such work is being performed plus all contributions specified in the job site local Agreement. If employees are sent to work on a project in an area where there is no local Agreement covering the work which falls within the scope of this Agreement, the full terms and conditions of this Agreement will apply.

(Doc. 15 ¶ 12; Doc. 26 ¶ 12 (emphasis added)).

By its terms, this agreement obliged Inter-State to abide by the provisions of the standard collective bargaining agreements in place in other labor locals' jurisdictions when doing work in those jurisdictions.

Even though Inter-State had severed its direct ties with Local 5, Local 5 was one of these other labor locals which had a standard collective bargaining agreement in place. On May 1, 2006, Local 5 entered into a standard collective bargaining agreement with various employers of tile workers within its jurisdiction. At some point after May 1, 2006, Local 5 learned that Inter-State was performing work within its jurisdiction without complying with the terms of this standard collective bargaining agreement. Accordingly, on July 11, 2006, Local 5 filed a grievance regarding Inter-State's alleged failure to comply with this traveling contractors clause. Specifically, the grievance alleged, in part, as follows:

> Under [the traveling contractors clause of Local 1's collective bargaining agreement], whenever Inter State performs work outside of the area covered by this collective bargaining agreement, Inter State has agreed "to abide by the full terms and conditions of the standard Agreement in effect on the job site area with respect to all employees, wherever hired, who perform such work." As you are aware, [Local 5] does have a standard collective bargaining agreement with various tile and marble contractors covering work of the type covered by the Local 1 collective bargaining agreement and work which is customarily performed by Inter State.
> . . .
>
> Since May 1, 2006, . . . Inter State has failed to comply with the provisions of the Local 5 agreement while performing work within the jurisdiction of Local 5 and the area covered by the Local 5 collective bargaining agreement. Based on information that Local 5 has received, Inter State has failed to pay to all of its employees performing work covered by the Local 1 and Local 5 collective bargaining agreements the mandatory wages and fringe benefits provided in the Local 5 collective bargaining agreement. For example, Inter-

State has failed to submit contributions to the employee benefit funds as provided for under the Local 5 agreement for the month of May, 2006.

When this initial grievance failed to resolve the dispute, Local 5 submitted the issue of Inter-State's failure to comply with the traveling contractors clause to arbitration, pursuant to the terms of the collective bargaining agreement. The arbitrator then held a hearing on December 5, 2006, in which both parties participated, and received submissions from both parties regarding the application of the traveling contractors clause to this case. Thus, Inter-State was given a full and fair opportunity to present facts and make legal arguments in its own defense at this arbitration proceeding.

Following these proceedings, on March 23, 2007, the arbitrator, Charles D. Long, Jr. rendered a decision in favor of Local 5. The decision held, in clear and precise terms, that the "traveling contractors clause in the Local 1 Agreement requires Inter-State to comply with the terms and conditions of [the] standard Agreement of [Local 5] even though Inter-State is not a signatory to that Agreement." The decision went on to direct that Inter-State "make retro-active pay adjustments to employees and make [Local 5] whole for all monies owing for required health and welfare contributions, including pensions, and to otherwise comply with the terms and conditions of the Local 5 Agreement . . . in effect at the job site area." (Doc. 28.)

Presented with this arbitrator's decision, Inter-State initially chose to pursue an uneven and uncertain course. Inter-State candidly admitted that it failed to comply with the mandates of this arbitrator's decision. Yet, Inter-State also failed to seek relief under state law in the form of an action to vacate, modify or correct the arbitrator's award. Thus, Inter-State's initial approach to this matter involved in equal measures a refusal to either contest, or comply with, the arbitrator's decision.

B.  **Local 5 Successfully Brings This Action in Federal Court to Enforce the Arbitrator's Award**.

Frustrated by Inter-State's failure to comply with the arbitrator's award, on June 27, 2007, Local 5 filed this action seeking enforcement of the arbitration award. (Doc. 1.) Inter-State responded by acknowledging that it had failed to comply with the mandates of this decision, (Doc. 4) but by asserting defenses to the enforcement of this action in federal court, defenses which did not include the claims currently advanced by the defendant.

These competing legal claims were heard, and determined, by the district court in 2008 on the parties' cross-motions for summary judgment. (Docs. 13, 16.) On August 6, 2008, the court entered an opinion and order resolving these legal claims in favor of Local 5, and against Inter-State. (Doc. 28.). In resolving these claims, the district court first found that Inter-State had largely waived its right to contest this arbitrator's award by failing to challenge that award in a timely fashion, stating that:

In the instant case, Local 5's complaint was filed well within the six year statute of limitations for confirmation actions. In contrast, Inter-State failed to file a motion to vacate within the thirty day limitations period. The court finds that this failure prohibits Inter-State from raising the same issues as affirmative defenses in the instant confirmation action. To hold otherwise would violate the public policy favoring finality of arbitration awards. Accordingly, the court must deny Inter-State's motion for summary judgment.

(Id. at 8-9)(citations omitted.)

The district court also concluded that this dispute was properly subject to arbitration, and rejected Inter-State's argument that this matter was not arbitrable, finding that:

[T]he broad language of the traveling contractors clause, which requires Inter-State to "abide by the *full* terms and conditions" of Local 5's collective bargaining agreement, incorporates the arbitration procedure that Local 5 utilized in this matter. Had the signatories to the Local 1 agreement wished to avoid such a result, they could have tempered the broad language of the traveling contractors clause or expressly excluded other unions' dispute resolution procedures from its scope. Because the signatories failed to do so, the court cannot now read into the traveling contractors clause an exception removing Inter-State's obligation to comply with the dispute resolution procedures of Local 5's collective bargaining agreement. By signing Local 1's agreement and subsequently working in an area covered by Local 5's agreement, Inter-State subjected itself to the dispute resolution procedures set forth in Local 5's agreement. Accordingly, the court finds that the dispute between Local 5 and Inter-State was arbitrable and that the arbitration award cannot be vacated on these ground.

(Id. at 13-14)(citations omitted.)

Thus, the district court's August 6, 2008 decision in this matter narrowly limited the range of issues which Inter-State could legitimately raise by finding that Inter-State

had waived many of these issues through its own inaction. The district court also affirmed as a legal matter that this dispute was properly the subject of arbitration between the parties, thus confirming the authority of the labor arbitrator to resolve these competing claims and enter an award on behalf of Local 5.

While Inter-State initially sought to appeal these rulings, (Docs. 30, 31), by July 2009 the company had abandoned its appeal, (Doc. 51) a decision which rendered the district court's summary judgment ruling the law of the case governing the merits of this dispute. With the dismissal of this appeal, this matter was remanded to the district court, where Local 5 filed a Motion for Contempt, (Doc. 52), and a Motion to Enforce and Liquidate Judgment (Doc. 60) in an effort to reduce the arbitrator's award to an enforceable legal judgment. These motions were then referred to the undersigned to address. (Doc. 56.)

## C.  **Loss Calculation Proceedings**

Following this  appointment, we immediately scheduled a conference with counsel, to establish procedures for promptly assessing the moneys owed to Local 5 on this longstanding arbitration award. (Docs. 57, 58 and 59.) As a result of these proceedings, the parties acknowledged that–subject to legal argument– this award could be readily calculated from Inter-State's own business records. Accordingly, a

schedule was set for the submission of contribution calculations and arguments from the parties on the proper measure of any judgment in this case. (Doc. 59.)

For its part, Local 5 responded to this order with a motion to enforce judgment, an accompanying 338-page affidavit, and a memorandum of law. (Docs. 60-62.) In these submissions, Local 5 relied upon the plain language of the collective bargaining agreement, and the wage information culled from the company's own records, to calculate specific sums which it claims it is entitled to receive under the collective bargaining agreement. Under the methodology employed by Local 5, the union began by noting that its collective bargaining agreement required Inter-State to contribute to three employee benefit funds—the Union Trowel Trades Benefit Funds of Central Pennsylvania ("Health and Welfare Fund"), the International Pension Fund ("IPF") and the International Masonry Institute ("IMI").

Under the terms of the agreement, (Doc. 61, Exhibit B) employers were required to pay hourly contribution rates for each hour, for each employee, to each Fund. Local 5 initially contended that the hourly rates of contributions, for the payroll periods in question, were as follows:

| Effective Date | Health and Welfare Fund | International Pension Fund | International Masonry Institute |
|:---:|:---:|:---:|:---:|
| 5/1/06 | $6.75 | $4.50 | $.74 |
| 5/1/07 | $7.50 | $4.50 | $.79 |
| 5/1/08 | $7.75 | $4.50 | $.84 |

Applying these contribution rates to the reported hours worked by Inter-State employees, which was derived from the company's own business records, at the outset Local 5 calculated the principal awards due to these funds as follows: the total amount due the Health and Welfare Fund was estimated at $1,045,465.50; the total amount due the International Pension Fund was set at $646,069.50; and the total amount due the International Masonry Institute was estimated at $112,245.79. (Doc. 61.) Thus, initial combined total principal amount of all contributions due from the company was assessed at $1,803,780.79. (Id.)

In its submission, Local 5 went on to note that there was a second component to the readily calculable losses here. Specifically, the collective bargaining agreement provided for the assessment of liquidated damages and interest when contributions are not timely submitted to the Funds, stating, in relevant part that:

> SECTION 3. If the Employer shall fail to make any contributions to the funds when same shall be due and payable, it shall be considered delinquent and in breach of this Agreement and shall pay as an additional amount to cover bookkeeping costs and other incidental expenses the sum of twenty (20) dollars, or five (5) percent of the amount of the delinquent payment, whichever is greater, plus interest at the rate of one and one-half (1-1/2) percent per month until paid to each Fund. In addition, the Employer shall be liable for the reason-able expenses, including attorney fees and accountant fees, incurred by each fund in the collection of the Employer's contributions.

(Doc. 61 ¶ 17.) Based on these provisions of the agreement, Local 5 calculated the amount of: 1) liquidated damages; and, 2) contractual interest due the Health and Welfare Fund, IPF and IMI. The total amount of liquidated damages due the Funds was initially calculated at $90,189.04 by Local 5. The total amount of interest due the Funds was initially assessed at $805,953.22.(Id.) Thus, the initial grand total amount of liquidated damages and interest due the Funds was calculated by Local 5 to be $896,142.26. (Id.)

Inter-State responded to Local 5's submission by advancing three principal arguments. (Doc. 65.) First, Inter-State raised a threshold legal question regarding who should be conducting these proceedings, asserting that the appropriate course in this matter was to remand this case to the arbitrator to clarify ambiguities in his March 2007 arbitration decision. Inter-State then cited two matters which it considered ambiguities requiring clarification. First, Inter-State argued that the award was vague because it did not distinguish between two different contribution rates, the mechanics' rate and the finishers' rate. Inter-State then pointed out that Local 5's initial calculation was based entirely upon the higher of these two rates, the mechanics' rate, and could therefore lead to an impermissible windfall for the union.

In addition, Inter-State invited the Court to remand this matter to the arbitrator for consideration of the fact that, while Inter-State may not have complied with the collective bargaining agreement, it did provide health benefits to its workers, an equitable mitigation factor which Inter-State suggested should be considered in determining whether Local 5 was entitled to any award of liquidated damages or interest whatsoever in this case.

Local 5 responded to Inter-State's submission by reasserting that it was entitled to liquidated damages, while conceding that these damages, interest and penalties should be substantially revised in light of Inter-State's objections to the contribution rates used to calculate these damages. (Doc. 68.) Applying the lower, finishers' labor rate, Local 5 then recalculated its damage claims in the following fashion:

Local 5 reduced the total amount that it claimed was due the Health and Welfare Fund from $1,045,465.50 to $1,011,130.63; the total amount due the International Pension Fund was reduced from $646,069.50 to $557,139.45; and the total amount due the International Masonry Institute was reduced from $112,245.79 to $108,556.37. (Doc. 68.) Thus, under this revised calculation submitted by Local 5, combined total principal amount of all contributions due from the company was reduced from $1,803,780.79, to $1,676.826.45. (Id.) Local 5 also revised downward its calculation of the liquidated damages and interest due and owing to the union. The

total amount of liquidated damages due the Funds was reduced from $90,189.04 to $83,841.32. The total amount of interest due the Funds was reduced from $805,953.22 to $749,336.90.(Id.) With these concessions, Local 5 argued that there was no remaining ambiguity in the arbitrator's award which would require a remand of this matter to the arbitrator, and sought enforcement of the arbitrator's decision, in the form of an order liquidating that award.

For the reasons set forth below, we recommend that the court enter judgment for Local 5 in the lower, revised amount that the Plaintiff concedes accurately reflects the sums due and owing under the collective bargaining agreement.

### III.   DISCUSSION

**A.   Legal Principles Governing Calculation of Contributions Under a Collective Bargaining Agreement.**

**1.   The Role of the Court**.

It is well-settled that the federal courts play only a limited role in resolving labor disputes, and that the courts must enforce any arbitration award that draws its essence from the collective bargaining agreement. *See News America Publications, Inc. v. Newark Typographical Union Local 103*, 918 F.2d 21, 24 (3d Cir. 1990). With respect to such determinations, it is clear that:

> " '[J]udicial review of a labor-arbitration pursuant to a collective bargaining agreement is very limited.' " *Nat'l Ass'n of Letter Carriers, AFL CIO v. U.S. Postal Serv.,* 272 F.3d 182, 185 (3d Cir.2001) (quoting

*Major League Baseball Players Ass'n v. Garvey,* 532 U.S. 504, 509 (2001) (per curiam)). The Supreme Court has repeatedly held that "a federal court may not overrule an arbitrator's decision simply because the court believes its own interpretation of the contract would be the better one." *W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers of America,* 461 U.S. 757, 764 (1983). In short, "if the arbitration award draws its essence from the collective bargaining agreement, a court should uphold it." *Id.* (citing *United Parcel Serv. v. Int'l Bhd. of Teamsters,* 55 F.3d 138, 141 (3d Cir.1995)). An award "fails to draw its essence from the collective bargaining agreement [only] if the arbitrator acted in manifest disregard of the law, or if the record before the arbitrator reveals no support whatsoever for the arbitrator's determination." *United Indus. Workers, Service, Transp., Professional Government of North America of Seafarers' ex rel. Bouton v. Gov't of the Virgin Islands,* 987 F.2d 162, 170 (3d Cir.1993) (citing *Tanoma Mining Co. v. Local Union No. 1269, United Mine Workers of America,* 896 F.2d 745, 748-49 (3d Cir.1990)).

*Pennsylvania Nurses Ass'n, Local 729, OPEIU/AFL-CIO v. John F. Kennedy Medical Center,* 247 F.Supp.2d 665, 671 (E.D.Pa. 2003).

In this case the arbitrator has spoken in a decision which has been found to draw its essence from the terms of the collective bargaining agreement. In clear and precise terms, the arbitrator held that the "traveling contractors clause in the Local 1 Agreement requires Inter-State to comply with the terms and conditions of [the] standard Agreement of [Local 5] even though Inter-State is not a signatory to that Agreement." The arbitrator's decision went on to direct that Inter-State "make retroactive pay adjustments to employees and make [Local 5] whole for all monies owing for required health and welfare contributions, including pensions, and to otherwise

comply with the terms and conditions of the Local 5 Agreement . . . in effect at the job site area."

Given this arbitrator's decision, and our responsibility to enforce any decision which draws its essence from a collective bargaining agreement, in calculating the amount of contributions or benefits owed under a collective bargaining agreement or an arbitration award our starting point is the language of the agreement itself. *See generally, Smith v. Contini*, 205 F.3d 597, 602 (3d Cir. 2000). Once the contribution formula provided for under the contract is identified, the principal remaining issues are to determine the number of hours of work performed under the collective bargaining agreement, and the appropriate hourly contribution rate, so the contribution formula can be properly applied to those hours worked. With respect to these issues, it is generally accepted that a labor organization may rely upon the company's own records to make this determination, and where those records are incomplete, the burden shifts to the company to identify any hours worked which fell beyond the scope of the collective bargaining agreement. *See, e.g., Motion Picture Industry Pension &Health Plans v. N.T. Audio Visual Supply, Inc.*, 259 F.3d 1063, 1066 (9th Cir. 2001); *Michigan Laborers' Health Care Fund v. Grimaldi Concrete, Inc.*, 30 F.3d 692, 696 (6th Cir. 1994); *Brick Mason Pension Trust v. Industrial Fence & Supply, Inc.*, 839 F.2d 1333, 1338 (9th Cir. 1988).

## 2. The Role of the Arbitrator

On occasion, parties to an arbitration award enforcement action in federal court will invite the court to remand the matter to the arbitrator for further proceedings. However, "[l]ike the Court's limited authority to disturb the award, a Court's authority to remand the matter to arbitration is fairly limited." *Mantaline Corp. v. PPG Industries, Inc.* No.02-269, 2006 WL 297263, at *4(W.D.Pa. 2006). The limited scope of this authority to remand had been aptly described in the following terms:

> As a general rule, once an arbitration panel renders a decision regarding the issues submitted, it becomes *functus officio* [in Latin, "a task performed"]and lacks any power to reexamine that decision. . . . .
>
> The policy underlying this general rule is an "unwillingness to permit one who is not a judicial officer and who acts informally and sporadically, to re-examine a final decision which he has already rendered, because of the potential evil of outside communication and unilateral influence which might affect a new conclusion." Further, notwithstanding the fact that an increased utilization of arbitration in recent years has to some extent created the office of the specialized professional arbitrator, "[t]he continuity of judicial office and the tradition which surrounds judicial conduct is lacking in the isolated activity of an arbitrator."
>
> . . . .
>
> [T]he common law *functus officio* doctrine contains its own limitations. We described these as follows. . . *:* (1) an arbitrator "can correct a mistake which is apparent on the face of his award,"; (2) "where the award does not adjudicate an issue which has been submitted, then as to such issue the arbitrator has not exhausted his function and it remains open to him for subsequent determination,"; and, (3) "[w]here the award, although seemingly complete, leaves doubt whether the submission has been fully executed, an ambiguity arises which the arbitrator is entitled to clarify."

*Colonial Penn Ins. Co. v. Omaha Indem. Co*., 943 F.2d 327, 331-332 (3d. Cir. 1991)(citations omitted).

With respect to these three narrow exceptions to the *functus officio* doctrine, which permit remand of matters to arbitrators, it is well-settled that "remand is to be used sparingly. Arbitrators are not as amenable to remand of a case for retrial in the same manner as are trial judges. Because an arbitration award must be upheld even when there have been 'errors ... in the determination of factual issues,' a remand that allows the arbitrators to reexamine their decision on the merits is not permissible" *Id.* at 334 (citations omitted). Moreover, a remand to an arbitrator is permissible only when that remand is limited and "in no way reopen[s] the merits of the controversy." *Teamsters Local 312 v. Matlack, Inc*., 118 F3d. 985, 992 (3d Cir. 1997). Applying these rigorous standards, invitations to remand matters to arbitrators, while frequently made, are only granted by the courts in limited, rare and unusual circumstances. *Compare, Oberwager v. McKechnie, Ltd.*, No. 06-2685, 2007 WL 4322982 (D.Del. Dec. 10, 2007)(denying remand request); *Local 825 IUOE v. Tuckahoe Sand &Gravel*, No. 06-4784, 2007 WL 1797657 (D.N.J. June 220, 2007)(same); *Mantaline Corp. v. PPG Industries, Inc*. No.02-269, 2006 WL 297263 (W.D.Pa.,2006)(same) *with, O&PIU, Local 471 v. Brownsville General Hospital*, 186 F.3d 326 (3d. Cir. 1999)(award ambiguous when third party refusal to comply with counseling provisions of arbitrator's decision made award unenforceable); *Teamsters Local 312 v. Matlack, Inc*., 118 F3d. 985 (3d Cir.

1997)(remand appropriate where arbitrator sends parties a letter limiting the scope of a prior award); *District 1199C v. Genesis Healthcare*, No. 08-1791, 2008 WL 5116899 (D.N.J. Dec. 2, 2008)(remand appropriate when back-pay order contained unresolved ambiguity).

**B.**   **The Application of These Legal Principles to This Arbitration Award Enforcement Action Calls For Enforcement of This Order Rather Than a Remand for Further Arbitration Proceedings**

In this case, application of these legal principles compels us to recommend that the Court decline Inter-State's invitation to remand this matter to the arbitrator for further proceedings. Instead, this Court can, and should, assess the amount owed under this thoroughly litigated arbitration award.

In its response to the motion to liquidate judgment, Inter-State cites two matters which it considered ambiguities requiring clarification by the arbitrator. First, Inter-State argued that the award was vague because it did not distinguish between two different contribution rates, the mechanics' rate and the finishers' rate. Inter-State then pointed out that Local 5's initial calculation was based entirely upon the higher of these two rates, the mechanics' rate, and could therefore lead to an impermissible windfall for the union. In addition, Inter-State argued that the Court should remand this matter to the arbitrator for consideration of the fact that, while Inter-State may not have complied with the collective bargaining agreement, it did provide health benefits

to its workers, an equitable mitigation factor which Inter-State suggested should be considered in determining whether Local 5 is entitled to any award of liquidated damages or interest whatsoever in this case.

We believe that the first issue cited by Inter-State, the question of the appropriate contribution rate, might have provided grounds for a remand, since remands are appropriate if there is an ambiguity in an award that prevents calculation of damages. *See*, *District 1199C v. Genesis Healthcare*, No. 08-1791, 2008 WL 5116899 (D.N.J.. Dec. 2, 2008)(remand appropriate when back-pay order contained unresolved ambiguity). In this case, however, any latent ambiguity regarding the appropriate hourly rate to apply has already been resolved in favor of Inter-State by Local 5's concession that the lowest applicable hourly rate should be used in calculating these damages. In light of this concession, a concession which reduced the amount of any award by approximately $190,000, it seems that there is no further, potentially prejudicial ambiguity with respect to this aspect of the award for Inter-State. Furthermore, from Inter-State's perspective there is nothing to be gained by a remand to the arbitrator for the limited purpose of identifying the appropriate contribution rate, since no arbitrator's decision could be more favorable to the company than the position already conceded by Local 5, a position which employs the lowest hourly rate to all hours worked by Inter-State employees. Therefore, local 5's

concession resolves this ambiguity entirely in Inter-State's favor and renders moot this objection to the arbitration award.

As for the second, alleged ambiguity suggested by Inter-State–namely, the fact that while Inter-State may not have complied with the collective bargaining agreement it did provide health benefits to its workers–in our view this alleged ambiguity does not provide grounds for a remand of this matter. In this regard, we note that Inter-State does not allege that this is a case where these mitigating facts were presented to the arbitrator, but the arbitrator's ruling was ambiguous in its treatment of this mitigating evidence. Quite the contrary, it appears that these claims in mitigation are being advanced for the first time in these proceedings.[3] Thus, Inter-State raises this matter now, after failing to present this issue: (1) to the arbitrator; (2) in a timely motion to set aside the arbitrator's award; (3) before the district court at the time of the initial summary judgment motions; and, (4) before the court of appeals in the appeal which it abandoned.

---

[3]Specifically, we note that none of the parties have claimed that this issue was ever raised before the arbitrator in the arbitration proceeding. Moreover, the arbitrator's decision does not allude to any such claims or arguments. Furthermore, Inter-State's answer to this complaint, and its summary judgment motion before the district court do not appear to advance this particular argument. (Docs. 4, 16, 17 18.)

We recommend that the court decline Inter-State's invitation to remand this case to the arbitrator in order to reexamine these belated, equitable mitigation issues for the following reasons:

First, this remand request does not fall within the narrow exceptions to the *functus officio* doctrine recognized by the courts. This is not an instance where the remand can be justified as necessary to: (1) correct a mistake which is apparent on the face of the award; (2) adjudicate an issue which was submitted, but not resolved, by the arbitrator; or, (3) where there is an ambiguity in the arbitrator's decision which only the arbitrator can clarify. Rather, this request is essentially an invitation to re-open this matter on legal, factual and equitable grounds that could have been presented, but apparently were not initially pursued by Inter-State before the arbitrator.

Moreover, a remand for the purpose of reexamining whether any award of damages to Local 5 is warranted here, coming three years after an arbitrator's decision which ordered Inter-State to "make retro-active pay adjustments to employees and make [Local 5] whole for all monies owing for required health and welfare contributions, including pensions," would, at bottom, invite the arbitrator to re-open this entire matter, something that arbitrators are generally forbidden from doing. *Teamsters Local 312 v. Matlack, Inc*., 118 F3d. 985, 992 (3d Cir. 1997)( a remand to an arbitrator is permissible only when that remand is limited and "in no way reopen[s]

the merits of the controversy".) Such a remand would also ignore the basic legal tenet in this field that "remand is to be used sparingly. Arbitrators are not as amenable to remand of a case for retrial in the same manner as are trial judges. Because an arbitration award must be upheld even when there have been 'errors ... in the determination of factual issues,' a remand that allows the arbitrators to reexamine their decision on the merits is not permissible" *Colonial Penn Ins. Co. v. Omaha Indem. Co*., 943 F.2d at 334 (citations omitted).

Furthermore, Inter-State's remand request misconstrues the proper role of mitigation evidence at this late date in this particular arbitration proceeding. In its pleadings, Inter-State broadly cites *Pa. Nurses Local 729 v. John F. Kennedy Medical Ctr*., 247 F.Supp.2d. 665, 678 (E.D. Pa. 2003), for the proposition that it is generally appropriate to a remand to an arbitrator to assess mitigation evidence. However, in fact, that case actually held that arbitrators have no independent, free-standing duty to consider proof of mitigation. *Id.* at 675-76. Quite the contrary, according to the court:

> An arbitrator's award which is silent on the issue of mitigation does not require the court to vacate the award or remand the case to the arbitrator. An arbitrator may, but need not, require mitigation of damages.

*Id.* at 676. Rather, in *Pa. Nurses Local 729* the issue of mitigation only became relevant, and required remand, because mitigation evidence was presented in a *timely*

24

manner at the arbitration proceeding, but was addressed in an ambiguous fashion by the arbitrator. Thus, *Pa. Nurses Local 729* stands in stark contrast to this case, where Inter-State does not contend that it made a timely mitigation presentation of mitigation evidence to the arbitrator that yielded some ambiguous response. Instead, Inter-State seeks leave here to re-open this matter before the arbitrator three years after the arbitration proceedings concluded for the sole purpose of permitting the company to belatedly present matters in mitigation that it neglected to pursue in 2006.

Finally, Inter-State's argument invites us, at this late date, to rule in a way which would undermine the prior decisions of the arbitrator, and the district court, both of whom have found that Local 5, and its members, were entitled to payment of benefits as required by the collective bargaining agreement. Thus, accepting this invitation to remand would, in effect, call upon us to generally re-open this arbitration decision under the guise of assessing the amount of the company's contribution and would invite the arbitrator to reexamine the merits of this decision three years after it was entered on grounds that were not timely presented, something arbitrators are typically forbidden from doing. Further, Inter-State asks us to adopt this course even after the district court sustained that arbitrator's award.

We believe that the law of the case doctrine cautions against this course of action. "Under the law of the case doctrine, once an issue is decided, it will not be

relitigated in the same case, except in unusual circumstances. . . . . The purpose of this

doctrine is to promote the 'judicial system's interest in finality and in efficient

administration. *Todd & Co., Inc. v. S.E.C.*, 637 F.2d 154, 156 (3d Cir. 1980).' "

*Hayman Cash Register Co. v. Sarokin* 669 F.2d 162, 165 (3d Cir. 1981). The contours

of this settled doctrine were recently described by the United States Court of Appeals

for the Third Circuit in the following terms:

> In *Arizona v. California,* 460 U.S. 605 (1983), the Supreme Court
> noted:
>
>> Unlike the more precise requirements of res judicata, law of
>> the case is an amorphous concept. As most commonly
>> defined, the doctrine posits that when a court decides upon
>> a rule of law, that decision should continue to govern the
>> same issues in subsequent stages in the same case.
>
> *Id.* at 618 (citations omitted). The "[l]aw of the case rules have developed
> 'to maintain consistency and avoid reconsideration of matters once
> decided during the course of a single continuing lawsuit.'"

*In re Pharmacy Benefit Managers Antitrust Litigation*, 582 F.3d 432, 439 (3d

Cir.2009)(reversing arbitration order in antitrust case on law-of-the-case

grounds)(citations omitted). It is clear that "[t]he ... doctrine does not restrict a court's

power but rather governs its exercise of discretion." *Id. (quoting, Pub. Interest

Research Group of NJ, Inc. v. Magnesium Elektron Inc.,* 123 F.3d 111, 116 (3d

Cir.1997)) (citations omitted). In exercising that discretion, however, courts should

"be loathe to [reverse prior rulings] in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would make a manifest injustice." *Id.( quoting Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 816 (1988)). In addition to that narrow class of cases where the prior ruling was manifestly unjust, the type of "extraordinary circumstances" that warrant a court's exercising its discretion in favor of reconsidering an issue decided earlier in the course of litigation typically exist only where (1) new evidence is available; or, (2) a supervening new law has been announced. *Id.( citing, Pub. Interest Research Group of NJ, Inc. v. Magnesium Elektron, Inc.,* 123 F.3d 111, 117 (3d Cir. 1997)).

Strict adherence to the law of the case doctrine is particularly important in this instance, which arises in the context of enforcement of a labor arbitrator's award under a collective bargaining agreement. In such disputes federal courts often observe that arbitrator rulings deserve deference, that the courts play only a limited role in resolving these labor disputes, and that the courts must enforce any arbitration award that draws its essence from the collective bargaining agreement. *See News America Publications, Inc. v. Newark Typographical Union Local 103*, 918 F.2d 21, 24 (3d Cir. 1990). All of these factors favoring deference to labor arbitration rulings weigh heavily in favor of giving full deference to the law of the case when the court is called upon to re-examine previously litigated questions in a way which would undermine

both an arbitrator's initial decision and a district court ruling which confirmed an arbitrator's decision.

In this case, Inter-State does not present any of the type of "extraordinary circumstances" which warrant abandoning the law of the case. Inter-State cites no supervening change in the law, and the factual matters raised by Inter-State were either known, or readily discoverable, at earlier stages in these proceedings. Therefore, there are no new legal or factual developments to consider here. Moreover, Inter-State has not shown that this decision was clearly erroneous and would result in a manifest injustice. Finally, Inter-State's efforts to avoid the application of the law of the case doctrine here ignore the fact that the company's current legal posture is a consequence of the choices which the company, through prior counsel, made earlier in this litigation. For example, Inter-State is limited in the defenses which it can assert at this late date because it chose not to timely pursue these issues in the arbitration process, before the district court or on appeal. Since Inter-State's current posture is the result of these tactical choices made by the Defendant, the equitable considerations which guide the law of the case doctrine weigh heavily against the company at this late date.

In sum, on these facts, we believe that a remand to the arbitrator is neither necessary nor appropriate. Therefore, the district court should decline this belated invitation to remand this matter to the arbitrator and, instead, assess damages in

accordance with the arbitrator's decision.

## C.    <u>Calculation of Contributions Owed in This Case</u>

In this case Local 5 has followed the procedures prescribed by law when calculating the benefit contributions owed by Inter-State. At the outset, Local 5 relied upon the plain language of the collective bargaining agreement, and the wage information culled from Inter-State's own records, to calculate specific sums which it claims it is entitled to receive under the collective bargaining agreement.

First, Local 5 turned to the plain language of the collective bargaining agreement to identify the contribution calculation formula. That collective bargaining agreement required the company to contribute to three employee benefit funds— the Union Trowel Trades Benefit Funds of Central Pennsylvania ("Health and Welfare Fund"), the International Pension Fund ("IPF") and the International Masonry Institute ("IMI").Under the terms of the agreement, (Doc. 61, Exhibit B) employers were required to contribute hourly contribution rates for each hour, for each employee, to each Fund. The collective bargaining agreement then provided, in clear and precise terms, for the assessment of liquidated damages and interest when contributions are not timely submitted to the Funds, stating, in relevant part that:

> SECTION 3. If the Employer shall fail to make any contributions to the funds when same shall be due and payable, it shall be considered delinquent and in breach of this Agreement and shall pay as an additional amount to cover bookkeeping costs and other incidental expenses the

> sum of twenty (20) dollars, or five (5) percent of the amount of the delinquent payment, whichever is greater, plus interest at the rate of one and one-half (1-1/2) percent per month until paid to each Fund. In addition, the Employer shall be liable for the reason-able expenses, including attorney fees and accountant fees, incurred by each fund in the collection of the Employer's contributions.

Having relied upon the collective bargaining agreement to set the contribution formula, Local 5 then followed the law, and was guided in its loss calculations by the plain language of the arbitrator's award, which instructed the company to ""make retro-active pay adjustments to employees and make [Local 5] whole for all monies owing for required health and welfare contributions, including pensions".

Adhering to this guidance, Local 5 obtained the company's records for the pertinent time period covered by the arbitrator's decision. Local 5 then engaged in extensive efforts to ascertain precisely how much of this work was done in the 20 county area encompassed within the union's jurisdiction in order to accurately identify the number of hours worked under the agreement. Finally, Local 5 applied the contribution formula set forth in the agreement to these hourly rates and hours of work which it could tie to work done under the agreement, a method of calculation approved by the courts.. *See e.g., Motion Picture Industry Pension &Health Plans v. N.T. Audio Visual Supply, Inc*., 259 F.3d 1063, 1066 (9th Cir. 2001); *Michigan Laborers' Helath Care Fund v. Grimaldi Concrete, Inc*., 30 F.3d 692, 696 (6th Cir. 1994); *Brick Mason Pension Trust v. Industrial Fence & Supply, Inc*., 839 F.2d 1333, 1338 (9th Cir. 1988).

Moreover, when Inter-State challenged one aspect of Local 5's initial calculation of these losses, and argued that Local 5's initial calculation was based entirely upon the higher of  two potential hourly rates, the mechanics' rate, Local 5 revised its calculations to exclusively rely upon the lower hourly rate, the finishers' rate, in assessing these damages. Applying these reduced contribution rates to the reported hours worked by Inter-State employees, as derived from the company's own business records, the principal awards due to these funds were properly calculated as follows: the total amount due the Health and Welfare Fund is $1,011,130.63; the total amount due the International Pension Fund is $557,139.45; and the total amount due the International Masonry Institute is $108,556.37. (Doc. 68.) Thus, under this revised calculation submitted by Local 5, the combined total principal amount of all contributions due from the company is $1,676.826.45. (Id.) Furthermore, the total amount of liquidated damages due the Funds is $83,841.32; and the total amount of interest due the Funds is $749,336.90. (Id.)

In sum, Local 5's revised calculations are accurate, and accurately reflect the payroll data provided by the company. Those calculations are based upon the plain language of the collective bargaining agreement, and the calculation pays full fidelity to the arbitrator's award, an award which was confirmed by the district court. The calculation was also revised downward in response to a meritorious objection made

by the company regarding the contribution rates initially used in making this calculation. Indeed, in its current form, the calculation relies upon the lowest hourly rate identified by the parties under the agreement. Therefore, it is recommended that the district court enter a judgment for Local 5, consistent with these calculations, the collective bargaining agreement, and prior decisions of both the arbitrator and this court.

## IV.   RECOMMENDATION

### III.   Recommendation

Accordingly, for the foregoing reasons, in consideration of the Motion for Contempt (Doc. 52), and the Motion to Enforce and Liquidate Judgment, (Doc. 60) filed by the Plaintiff, Local 5, both of which seek to enforce and liquidate an arbitration award entered by a labor arbitrator in March 2007, following an hearing in December 2006, **IT IS RECOMMENDED**, in accordance with the collective bargaining agreement, and the arbitrator's decision, that judgment be entered in the following principal amounts:

1. The total amount due the Health and Welfare Fund is $1,011,130.63;

2. The total amount due the International Pension Fund is $557,139.45; and,

3. The total amount due the International Masonry Institute is $108,556.37.

**IT IS FURTHER RECOMMENDED**, in accordance with the collective bargaining agreement, and the arbitrator's decision, that judgment be entered, consistent with Section 3 of the collective bargaining agreement for: 1) liquidated damages; and, 2) contractual interest due the Health and Welfare Fund, IPF and IMI, in the following amounts:

1. The total amount of liquidated damages due the Funds is $83,841.32.

2. The total amount of interest due the Funds is $749,336.90.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 18th day of March, 2010.

*S/Martin C. Carlson*
**United States Magistrate Judge**